**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **SA-25-CR-75-XR** |
| | § | |
| **JUAN RAMON HERNANDEZ-LIMON** | § | |
| | § | |

**ORDER ON MOTION TO SUPPRESS**

On this date, the Court considered Defendant's Motion to Dismiss Indictment and Motion to Suppress (ECF No. 25) and the parties' arguments on April 24, 2025.

On April 28, 2021, Defendant Juan Ramon Hernandez-Limon was convicted of illegal reentry and being an alien in possession of a firearm. *See United States v. Hernandez-Limon*, 5:20-cr-437-OLG-1 (W.D. Tex.) (ECF No. 46). On February 8, 2024, he was again convicted for illegal reentry. *See United States v. Hernandez-Limon*, 5:23-cr-497-XR (W.D. Tex.) (ECF No. 30). He was deported to Mexico on or about September 23, 2024.

On February 19, 2025, the Defendant was indicted again for illegal reentry and has now moved to dismiss the indictment and to suppress evidence. The Court held a hearing on April 24, 2025 ("April 24 Hearing").

## I. Background

On January 6, 2025, agents with the U.S. Immigration and Customs Enforcement ("ICE") suspected that the Defendant again had reentered the United States and was living at a residence in San Antonio. Eventually the agents concluded that he was living at 1718 Arbor Place. ICE agents had an administrative warrant for the arrest of Hernandez-Limon.

1

About 12:20 p.m.[1] on January 26, 2025, agents arrived at the residence, saw the vehicle that he was suspected of using, and then saw a male exit the vehicle.  When the agents approached the Defendant he ran into the residence.[2]  Two agents were stationed on Camada Street at the back of the house to maintain surveillance.  Two or three officers were stationed at the front of the home. Using loudspeakers, they instructed the Defendant to exit the residence.  At some point the Defendant attempted to flee and began to scale a fence bordering the neighboring residence.  Task Force Officer ("TFO") Juan Jose Ortiz observed the Defendant and told him there was a drone in the air.  A female inside 1718 Arbor Place then called out to the Defendant to come back inside the residence.[3]

Around 12:35 p.m., TFO Ortiz requested assistance from the San Antonio Police Department to control pedestrian and vehicle traffic in the area.

About 1:45 p.m., a negotiator arrived at the residence and began to investigate what contact information may be available for anyone inside the home.  From 2:30 to 2:45, a negotiator spoke with a female and requested that the family exit the home.  The female hung up the phone during

---

[1] All times given at the April 24 Hearing in this case and provided by the parties in their briefs were estimates. The officers at the scene on January 26 used cell phones to text each other.  The witnesses used their cell phones to record events.  Some of the officers used either cell phones or body cam to record.  No one in this case, however, provided metadata from these devices that would have more accurately captured the timeline of events.  At first, it appeared that there was going to be an issue as to whether the property lines were breached before the judicial warrant was secured.  But this was not pursued at the hearing.

[2] There is a question as to whether the Defendant was approached by an agent and asked if he was Juan, and then the Defendant ran into the home or whether the Defendant came home from church, entered and then left the house to walk his dog, and then was approached by an agent.  These differing scenarios do not alter the analysis or outcome of this matter.  When an agent approached him, Hernandez-Limon testified at the April 24 Hearing that he knew they were there to arrest him for illegal reentry.

[3] Again, the testimony at the April 24 Hearing differed slightly.  The Defendant acknowledges that he contemplated jumping the fence, but testified he did not actually do so.  These differences do not alter the analysis or outcome of this matter.  In addition, the fact that TFO Ortiz lied to the Defendant about the presence of aerial surveillance or drone in the area is of no consequence.

the first call and during a subsequent call stated that she is speaking with a lawyer and that he advised her to discontinue talks.[4]

The officers thereafter maintained a perimeter outside the home.  Agents were aware that in addition to the Defendant, a woman and young infant were inside the home and potentially other people.

At some point it was determined that because of the ongoing standoff with the Defendant refusing to leave the premises, an arrest warrant would need to be secured from a federal judge and that the Special Response Team ("SRT") may be needed.[5]  An Arrest Warrant was secured from a United States Magistrate Judge at 3:00 p.m.[6]

Around 3:35 p.m., the SRT stationed a Bearcat—an armored tactical police vehicle—in front of the residence and a knock and announce was done using the Bearcat's Long Range Acoustic Device ("LRAD"), a specialized loudspeaker, instructing the occupants to exit the house. The agents clearly announced that they had an arrest warrant.  But the command was ignored.

Thereafter, periods of activity and inactivity ensued.  At points the officers instructed the occupants to exit the house.  At other times, distraction devices were deployed outside the house with noise and flash to try to get the Defendant to exit the home.  At some point, the Bearcat's boom was used to breach the front door window and door to ascertain who else may be inside.  A female then emerged and shut the door.  Another male emerged and began to shout expletives to

---

[4] Once again there are conflicting statements made that are of no consequence.  For example, during one of the calls the female states that a lawyer was on the way to the scene.  No attorney ever appeared during the five-hour standoff.

[5] It is noteworthy that the ICE agents did *not possess* any tactical devices and *needed to request* the presence of a SRT team, whose deployment required supervisory approval. The facts of this case do not demonstrate a blanket "intimidate and denigrate illegal aliens policy," but a case-by-case analysis of an arrest situation.

[6] *See United States v. Hernandez-Limon*, No. SA:25-MJ-123 (W.D. Tex.) (ECF No. 3).

the law enforcement officers and "shot the finger." Inert 40 mm Ferret (powder chemical agent) rounds were fired into the home to try to get the Defendant to exit the home. Also, a "throw bot" (a micro-robot system that provides real-time video and audio reconnaissance) was put inside the house. Still, no one emerged from the home.

From 3:50 to 4:03 p.m., negotiators again tried to contact the female they had spoken with during earlier negotiations, but all calls went to voicemail.

Around 5:45 p.m., the Defendant finally exited the house carrying an infant. He was then arrested.

## II.    Analysis

Defendant argues that the Indictment in this case should be dismissed because the law enforcement officers violated his substantive due process rights by arresting him using means that "shock the conscience." Alternatively, he argues that the agents violated the Fourth Amendment by seizing him with excessive force. He also argues the conduct at issue here constituted an in-home seizure in violation of the Fourth Amendment.

### A.  Due Process Claim

The Fifth Circuit has "consistently held that '[g]overnment misconduct does not mandate dismissal of an indictment unless it is 'so outrageous' that it violates the principle of 'fundamental fairness' under the due process clause of the Fifth Amendment. 'Such a violation will only be found in the rarest circumstances.' Thus, a defendant who asserts the defense of outrageous government conduct has an extremely high burden of proof." *United States v. Asibor*, 109 F.3d 1023, 1039 (5th Cir. 1997) (internal citations omitted). "Furthermore, in order to avail himself of the outrageous conduct defense, the defendant must show government overinvolvement combined

with a passive role by the defendant.  Where the court finds that the defendant is an active, willing participant in the criminal conduct that leads to his arrest, we will not find outrageous government conduct." *Id*. at 1039 (internal citation omitted).

First, prior to obtaining an arrest warrant, no law enforcement officer acted inappropriately. Five officers arrived at the scene with the knowledge that the Defendant had a prior conviction for alien in possession of a firearm, and so there was a heightened security risk.  And no unlawful entry into the home was made.

The Defendant argues that repeated calls to the cell phone, verbal commands to exit the home, agents positioned in the front and rear of the home, and the length of the standoff were individually or collectively outrageous.  The Court disagrees.  The agents had lawful authority to arrest the Defendant, but they could not enter the residence without a judicial warrant that would allow entry into the home.  The agents attempted to make an administrative warrant arrest within the confines of the Fourth Amendment, attempted to ensure that the Defendant did not flee the scene, and were balancing against an unknown threat (the possibility of a weapon in the home, unknown others, and another male in the home who was openly hostile).

Once the arrest warrant was obtained from the United States Magistrate Judge, the agents clearly communicated to the Defendant that they had a warrant and instructed him to exit the home. He refused the directive.  Giving the Defendant and his family the benefit of the doubt, they may have been under the incorrect assumption that the officers needed to risk approaching the home and show the Defendant the warrant.  In hindsight, maybe one of the agents should have offered to show the warrant to one of the family members, who could have communicated this information to the Defendant.  But the Court is not here to second-guess the situation from afar.  The officers did not have to do any of the above and it was incumbent on the Defendant to comply with the

5

order to exit the house after he was informed there was a warrant for his arrest. Regrettably, misunderstandings and inadequate information are being passed around the internet and social media about what one can and cannot do if approached by immigration agents.

Nevertheless, Defendant argues that after the warrant was obtained, the deployment of the SRT armored vehicle, the use of the flash and bang devices outside the home, and the insertion of Ferret inert gas projectiles inside the home were outrageous.

Courts in this circuit have concluded that the use of tear gas is acceptable under situations where a defendant refuses to comply with lawful orders to surrender. *See Andrade v. United States*, 116 F. Supp. 2d 778, 788 (W.D. Tex. 2000), *aff'd sub nom. Andrade v. Chojnacki*, 338 F.3d 448 (5th Cir. 2003). No comparable cases to this one could be located.

The Court agrees that in hindsight the deployment of the SRT and tactical devices was unnecessary.[7] The deployment of the inert gas into the home, although not like tear gas as defense counsel suggests, nevertheless was a safety hazard to the infant inside (not from inhalation but from potentially being struck). But the Defendant was deliberately not complying with orders to exit the home. The question before the Court is whether the Government's conduct after the judicial warrant was secured was so outrageous that it violates the principle of fundamental fairness under the due process clause of the Fifth Amendment. As stated above, such a violation will only be found in the rarest circumstances.

In this case the Defendant essentially argues that all the law enforcement officers should have left the scene and attempted to later arrest him at some later point in a public location. Or at

---

[7] In an earlier illegal reentry arrest, the Defendant was taken into custody without major incident at his place of employment.

least the SRT should have left, and permitted the standoff to continue with just a few officers until some undetermined point in time.  A defendant who asserts the defense of outrageous government conduct has an extremely high burden of proof, and these arguments do not meet that standard.

Further, most "outrageous conduct" cases deal with allegations of entrapment or discovery misconduct by the Government.  That is because such conduct violates the principle of "fundamental fairness" under the due process clause of the Fifth Amendment.  But even those types of cases in the Fifth Circuit generally do not allow for dismissal of an indictment.  *See United States v. Mauskar*, 557 F.3d 219, 232 (5th Cir. 2009) ("government's failure to disclose Williams's forgery of Mauskar's signature on documents relating to the charges against him" insufficient to establish outrageous conduct.  On the other end of the spectrum, courts have suggested that if Government agents induce a defendant to become involved for the first time in criminal activity, that would be sufficiently outrageous; *United States v. Leal*, 32 F.4th 888, 896 (10th Cir. 2022) (yet concluding that the defendant failed to meet this showing).  Here, the acts done to get the Defendant to exit the home do not implicate any due process concerns.[8]

## B. Fourth Amendment Claims

The Defendant's alternate arguments that the agents violated the Fourth Amendment by seizing him with excessive force fail because no evidence was presented to support that claim.

---

[8] Defendant's analogy to *Rochin v. California* is unpersuasive. In *Rochin*, the Supreme Court held that due process bars the government from prosecuting a defendant if its agents engage in conduct that "shocks the conscience." 342 U.S. 165, 172 (1952). There, the facts show that officers forcefully pumped emetic solution through a tube into the defendant's stomach causing him to vomit up two capsules of morphine. *Id.* at 166. Here, ultimately the Defendant voluntarily exited his home at which time he was arrested without incident. Otherwise, defense counsel, citing the late Pope Francis, urges that immigrants be treated with dignity and not be subjected to unnecessary suffering. *See* https://www.vaticannews.va/en/pope/news/2025-02/pope-francis-us-bishops-migration-deportation-human-dignity-righ.html.

The Defendant eventually exited the home, and no excessive force was applied to his person during the arrest.

Further, his argument that the conduct at issue here constituted an in-home seizure in violation of the Fourth Amendment fails. To the extent this argument is applied to the period of time after the judicial warrant was secured, that argument lacks merit. The agents were empowered by the warrant to arrest the Defendant at that residence. If this argument is being made for the period between the agents' arrival at the home and the warrant being secured, any argument that he was essentially confined against his will fails because he was not confined. Indeed, at various times he was asked to exit the home. He only refused to leave the house because he understood that he would be arrested.

### C. Identity Suppression

The Defendant argues that he was illegally arrested, and this should prohibit the Government from using his body or identity (A file). As stated above, the Court has concluded he was not illegally arrested. The Defendant also concedes this argument is foreclosed by Fifth Circuit precedent and accordingly this motion is denied. *United States v. Hernandez-Mandujano*, 721 F.3d 345, 351 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 2134 (2014) (finding unconstitutional seizure but affirming suppression denial due to Fifth Circuit precedent; alien's INS file and even his identity itself are not suppressible); *see also United States v. Pineda-Chinchilla*, 712 F.2d 942, 943 (5th Cir. 1983) (rejecting suppression and argument that "because his illegal arrest necessarily revealed his identity and presence at the scene, the arrest led the government to records indicating the 'non-existence of proper authorization to be in the United States.").

## CONCLUSION

Based on the facts presented at the April 24 Hearing, Defendant has failed to overcome the high barrier to establish outrageous government conduct that shocks the conscience. The Court agrees that, in hindsight, more restraint could have been shown. But Defendant's Motion to Dismiss Indictment and Motion to Suppress (ECF No. 25) is **DENIED**.

It is so **ORDERED**.

**SIGNED** this 29th day of April, 2025.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE